Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

STATE OF RHODE ISLAND             SUPERIOR COURT
NEWPORT, S.C.

|  |  |
|---|---|
| CAROLYN RAFAELIAN, INDIVIDUALLY and as trustee of THE CAROLYN A. FERLISE QSST 1994 TRUST and THE CAROLYN A. RAFAELIAN TRUST 2004, and derivatively on behalf of Cinerama Jewelry, Inc. and Pentagon Properties, Inc.<br><br>    *Plaintiffs*,<br><br>v.<br><br>REBECCA RAFAELIAN CARUOLO, individually and in her role as trustee of The Rebecca Rafaelian Caruolo QSST 1994 Trust and The Rebecca Rafaelian Caruolo Trust 2009, PRODUCTIVE COLLABORATION, LLC, CINERAMA JEWELRY, INC. (Nominal Defendant), and PENTAGON PROPERTIES, INC. (Nominal Defendant)<br><br>    *Defendants*. | C.A. No.  NC-2025-0531 |

## AMENDED VERIFIED COMPLAINT

Carolyn Rafaelian ("Carolyn"), by her undersigned counsel, hereby brings this Amended

Verified Complaint for Damages, Appointment of a Temporary and Permanent Receiver, and

Injunctive Relief, and Jury Trial Demand, and sues in her individual capacity and, as trustee on

behalf of certain shareholding trusts hereinafter specified, and derivatively on behalf of Nominal

Defendants Cinerama Jewelry, Inc. ("Cinerama" or the "Factory") and Pentagon Properties, Inc.

("Pentagon"), and against Rebecca Rafaelian Caruolo ("Rebecca"), individually and in her role as

trustee of The Rebecca Rafaelian Caruolo QSST 1994 Trust and The Rebecca Rafaelian Caruolo

Trust 2009, and Productive Collaboration, LLC d/b/a Air & Anchor ("Productive Collaboration"

1

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 2 of 44 PageID #: 8

or ("Air & Anchor") for: damages for breach of fiduciary duty, breach of lease, civil conversion, misappropriation of corporate opportunity, and waste against Rebecca Rafaelian Caruolo; damages for aiding and abetting a breach of fiduciary duty and conversion, violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) and an equitable decree of alter-ego Air & Anchor and for the appointment of a receiver of Air & Anchor; and for preliminary and permanent injunctive relief against all Defendants and any persons or entities acting for or on their behalf to restrain and enjoin them from using in any way the assets, reputation, image, likeness, and accumulated goodwill of either Carolyn and/or Cinerama and/or Pentagon.

## I.    INTRODUCTION

1.    This is a family shareholder dispute involving the complete defalcation of a preeminent Rhode Island jewelry company, Cinerama, by its majority shareholder and President, Rebecca. In concert with Air & Anchor, and unknown to Carolyn, Rebecca used her position as President of Cinerama to create a new business venture using all of the assets of Cinerama, as well as those of Pentagon, for the sole purpose of excluding and divesting Carolyn of her interest in Cinerama and Pentagon.

2.    Specifically, this is an action for, among other things, shareholder oppression and self-dealing by Rebecca, the President and shareholder of two (2) separate Rhode Island close corporations indirectly owned by her and Carolyn. The conduct of Rebecca relative to these companies has had the cumulative effect of completely "freezing out" Carolyn, as well as severely diminishing the value of the companies' shares.

3.    Concealed from Carolyn as a mere subtenant leasing a portion of space from Cinerama to start a jewelry business, the new enterprise, Air & Anchor, is in fact a knock-off of Carolyn's Alex + Ani jewelry brand, created from the complete takeover and de facto liquidation

2

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

of Cinerama and its assets.  Indeed, Air & Anchor uses all of Cinerama's factory space, equipment, inventory, phone number, management, trade secrets, tradename, vendor relationships, goodwill and reputation and is the functional *alter ego* of Cinerama. Upon information and belief, Rebecca manages and controls the daily operations of the new enterprise, leaving Cinerama a shell company, existing merely to conceal the misappropriation of Cinerama's assets, subsidize Rebecca's new business venture, and mislead Carolyn as to the value of her shares in Cinerama.

4.      By this lawsuit, Carolyn seeks to protect, preserve and realize the full value of her shareholder interest in her family's businesses and their assets, reputation, image, and goodwill, and to protect her own assets, reputation, image and commercial likeness of entities previously or currently closely associated with her in the marketplace for fine custom retail jewelry, from the wrongful acts of the Defendants as hereinafter alleged.

5.      As the President of Cinerama and Pentagon, and indirect majority shareholder in Cinerama, Rebecca has a fiduciary obligation to protect, preserve and maximize the value of the respective companies' business opportunities for the benefit of all of its shareholders, not just herself.

6.      Notwithstanding this obligation, Rebecca never presented the new Air & Anchor opportunity to Cinerama, Pentagon, or Carolyn. Instead, Rebecca unilaterally, and without Carolyn's knowledge and required consent, allowed Air & Anchor to utilize the assets, name and goodwill of Cinerama, Pentagon, and Carolyn for less than fair value or for no value at all and wrongly converted the property of Cinerama, Pentagon and of Carolyn for the use and benefit of Air & Anchor and Rebecca and to the unfair exclusion of Carolyn.  By their conduct, Rebecca and Air & Anchor also deprived Carolyn and continues to deprive her, of existing and prospective economic opportunities.

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM     Document 1-1     Filed 05/08/26     Page 4 of 44 PageID #: 10

7. Both individually and derivatively on behalf of Cinerama and Pentagon, Carolyn seeks damages from the Defendants for their acts and omissions as aforesaid and seeks a preliminary and permanent injunction barring the Defendants and all persons with notice thereof from using Cinerama's and Carolyn's assets, image, likeness and goodwill without express permission. Further, Carolyn seeks a declaration that Air & Anchor is the *alter ego* of Cinerama, and the appointment of a receiver of Air & Anchor to effectuate that decree.

## II.     PARTIES

8. Plaintiff Carolyn is a resident of the State of Florida, an officer and director of Pentagon, an indirect forty three percent (43%) shareholder of Cinerama through various trusts of which she is a beneficiary and trustee, namely the Carolyn A. Ferlise QSST Trust-1994 and The Carolyn A. Rafaelian Trust-2004, and an indirect fifty percent (50%) shareholder of Pentagon through a trust of which she is a beneficiary and trustee, namely The Carolyn A. Rafaelian Trust-2004.

9. Plaintiff the Carolyn A. Ferlise QSST Trust-1994 owns a 19.5% interest in Cinerama Jewelry, Inc.

10. Plaintiff The Carolyn A. Rafaelian Trust-2004 owns a 23.5% interest in Cinerama Jewelry, Inc. and a 50% interest in Pentagon.

11. Nominal Defendant Cinerama is a corporation organized and existing under the laws of the State of Rhode Island and has its principal place of business at the factory at 115 Pettaconsett Avenue, Cranston, Rhode Island.  Cinerama is a close corporation within the meaning of R.I. Gen. Laws § 7-1.2-1701.

12. Nominal Defendant Pentagon is a corporation organized and existing under the laws of the State of Rhode Island and has its principal place of business at 115 Pettaconsett Avenue,

4

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Cranston, Rhode Island. Pentagon is a close corporation within the meaning of R.I. Gen. Laws § 7-1.2-1701.

13. Defendant Rebecca is a resident of the State of Rhode Island, the sister of Carolyn, an officer and director of Cinerama and Pentagon, an indirect fifty seven percent (57%) shareholder of Cinerama through various trusts of which she is a beneficiary and trustee including the Rebecca R. Caruolo QSST 1994 Trust and the Rebecca Rafaelian Caruolo Trust-2004, and a direct fifty percent (50%) shareholder of Pentagon.

14. Defendant Productive Collaboration, LLC d/b/a Air & Anchor is a Rhode Island limited liability company formed in 2018 by Rachel Ajaj, the niece of Carolyn and Rebecca, Rachel's husband Omar Ajaj, and upon information and belief, Rebecca, as managers and/or members. It adopted the fictitious name Air & Anchor in June of 2019.

## III. JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this dispute and the parties under and pursuant to R.I. Gen Laws §§ 8-2-13 and 14.

16. Venue of this action is proper in this Court under and pursuant to R.I. Gen Laws § 8-2-27.

## IV. STATEMENT OF FACTS

### A. The Family Roots of Cinerama, Alex + Ani, and Air & Anchor

17. Cinerama was formed by Mr. Ralph Rafaelian in 1966 for the purpose of engaging in the design, manufacture and sale of fine custom jewelry. From and after its formation until some time prior to his death in 2012, Mr. Rafaelian was the President, Chief Operating Officer and sole shareholder of Cinerama. Cinerama has at all times been referred to by Ralph, Rebecca, Carolyn, the general public and its customers as the "Factory."

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

18.    In 1991, Mr. Rafaelian formed another Rhode Island corporation, Pentagon, for the purpose of acquiring, owning and managing certain improved real property including the factory located at 115 Pettaconsett Avenue, Cranston, Rhode Island (the "Property"), which has since then and to date, been the principal manufacturing and place of business for Cinerama, which leases all of premises at the Property.

19.    In 2006, Pentagon also acquired the improved residential property located at 91 Tupelo Hill Drive, Cranston, Rhode Island ("Tupelo Hill"). The Tupelo Hill property is leased to a tenant.

20.    From and after the formation of Pentagon until some time prior to his death, Mr. Rafaelian was President, Chief Operating Officer and sole shareholder of Pentagon. In approximately 2012, Carolyn and Rebecca each acquired an indirect fifty percent (50%) ownership interest in Pentagon through various trusts of which each was a beneficiary and trustee, and each was appointed and has since then continually served as an officer of Pentagon.

21.    Carolyn was born around the time of Cinerama's formation, and Rebecca a few years later.

22.    From the time they were children, Carolyn and Rebecca spent much of their time around the Factory, later working closely with their father, Mr. Rafaelian. When Carolyn was a child, her mother Lucy Rafaelian would often send her to the Factory to be with her father to keep her occupied. Carolyn initially started out "carding" jewelry—the process of presenting jewelry for retail sale on a display card—but quickly learned how to wield a blow torch and to design jewelry in her own unique style and manner.

23.    From and after the time of their initial involvement with Cinerama as children, both Carolyn and Rebecca became increasingly involved in the management and operations of

6

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 7 of 44 PageID #: 13

Cinerama. Carolyn was responsible for creative design at Cinerama and her sister, Rebecca, was responsible for manufacturing and operations.

24. During the time she worked at Cinerama and thereafter, Carolyn purchased and housed a significant inventory of valuable and unique crystals, beads, and stones at Cinerama, which she organized and maintained in boxes located at the Factory and which bore her name, the quantity of the stones, and her signature.

25. Currently, Rebecca, as the President of Cinerama and its indirect majority and controlling shareholder through her trusts, controls the management and operation of Cinerama.

26. Moreover, as set forth in Sections 2.7 and 2.8 of the Cinerama corporate Bylaws, Rebecca, as the indirect holder of the majority of the stock issued and outstanding and entitled to vote, controls Cinerama's business and affairs.

**B. Alex + Ani is Formed, Realized and Achieves Astonishing Success**

27. In 1999, Carolyn began designing jewelry for certain specialty retailers, then experimented with soldering metals into bracelets and designing charms and figures on them— arguably the start of the more current trend of using jewelry for self-expression.

28. In 2003, as Carolyn's creative force was beginning to achieve critical mass, she formed Alex + Ani as a domestic corporation.

29. From and after the time of its initial formation in 2003, Carolyn was the principal owner, officer and creative force behind Alex + Ani, and its financial and creative fortunes soared under her guiding hand. She sought and obtained her first patent for what became the renowned Alex + Ani bangle in 2004. By 2014, its sales had reached $350 million and its estimated enterprise value was $1 billion.

7

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

### C.    Carolyn's Family and Cinerama Directly Benefit from her Success

30.    Consistent with the approach she learned from her father, Carolyn always endeavored where practicable and prudent, to do what was right and bring her family and Cinerama along with her and to let them share in the fruits of her creative and business success.

31.    Carolyn awarded all the manufacturing, assembly and related work possible from Alex + Ani to Cinerama, paying fair market value for the use of Cinerama's valuable resources, including its trade secrets, vendors relationships, equipment, management, goodwill and reputation in the industry.  Cinerama and Rebecca profited significantly from Alex + Ani's purchase orders.

32.    Ultimately, in 2016, Alex + Ani entered into an Asset Purchase Agreement with Cinerama, pursuant to which Alex + Ani purchased certain assets of Cinerama for over $100 million dollars.

33.    In addition to the aforesaid commercial arrangements and business transactions between Alex + Ani and Cinerama, Carolyn caused her niece Rachel, and Rachel's husband, Omar, to be employed at Alex + Ani, where they enjoyed significant salaries and benefits.

34.    All of the foregoing benefits that Carolyn bestowed on Cinerama and her family members resulted in substantial financial gains for Cinerama and its shareholders, including Rebecca.

### D.    Rebecca, Rachel and Omar Launch Air & Anchor based upon the Cinerama/Alex + Ani Foundation, Assets, Image and Goodwill

35.    As a consequence of disagreements with the outside equity investors in Alex + Ani, in 2019 Carolyn resigned her position at Alex + Ani, and by 2021, no longer had any management role or equity in the company.

36.    Rachel and her husband Omar also left the employment of Alex + Ani; Rachel left in 2019, and Omar left in 2018.

8

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

37.    In 2019, Rebecca, Rachel, and Omar saw the distress Alex + Ani was experiencing and recognized the opportunity to duplicate Carolyn's business plan and begin a wholesale manufacturing and retail jewelry enterprise identical to Cinerama and Alex + Ani. Rather than contract with Cinerama for its services as Carolyn had done and build retail business of their own, they conspired and agreed to simply take Cinerama for themselves and designed a scheme to disenfranchise Carolyn from her interest in Cinerama.

38.    Creating a name with striking resemblance to Alex + Ani, in June of 2019 Rebecca and Rachel founded Productive Collaboration, LLC d/b/a Air & Anchor. Their business plan was simple, take over Cinerama entirely via a purported "sublease" and attempt to market its wholesale manufacturing services under the name of a new limited liability company they founded, Productive Collaboration.

39.    Productive Collaboration is a direct competitor of Cinerama.

40.    Productive Collaboration uses Cinerama's phone number, inventory, assets machinery, goodwill, reputation, and vendors, and advertises that it controls the entire Property, as shown below:



9

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

41.     The business plan included the launch of a retail brand under the name Air & Anchor using Cinerama's highly valuable vintage inventory archives, designs, intellectual property, personnel, trade secrets, goodwill, reputation and vendor relationships.

42.     To disguise their scheme, they created a sublease for use of only a portion of the Property's premises, despite occupying the entire Property and misappropriating all of Cinerama's valuable assets for themselves.

43.     Specifically, on or about July 1, 2020, Pentagon purported to enter into and execute a Lease Agreement with Cinerama providing for Cinerama's use and occupancy of the Property for a prescribed five (5) year term for an annual base rent of $120,000.00 per annum, paid in equal monthly installments of $10,000.00 per month, in addition to Cinerama being responsible for property taxes and the cost of maintenance of the Property (the "Cinerama Lease"). A copy of the Cinerama Lease is attached hereto as Exhibit A. The Cinerama Lease expired on June 30, 2025.

44.     Pursuant to the terms of the Cinerama Lease, the only permitted use of the premises was for Cinerama's "operation of a jewelry manufacturing business and allied and ancillary activities." The Cinerama Lease further stated that the "premises shall be used solely for the purpose set forth above and not for any unlawful purpose…."

45.     The Cinerama Lease prohibited subletting except with the written consent of Pentagon.

46.      Cinerama thereafter purportedly entered into and executed a so-called Amended and Restated Sublease with Air & Anchor providing or affording it with use and occupancy of a portion of the Property (the "Sublease"). The Sublease term was from February 1, 2019, to June 30, 2025, at which time the same expired of its own terms.   A copy of the Amended and Restated Sublease dated February 1, 2019 (the "Sublease") is attach hereto as Exhibit B.

10

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

47.     Pursuant to the Sublease, Air & Anchor was required to remit and pay to Cinerama the sum of $6,045.00, plus $1,000 per month in exchange for the use and occupancy purportedly provided for under the Sublease.  The rental amount was woefully deficient, drastically below market rate and commercially unreasonable.

**E.    Air & Anchor Converts Cinerama's Goodwill and Engages in False Advertising**

48.     Air & Anchor holds itself out to the public as the "Factory" and having been in business "since 1966" in its sales and marketing efforts including in its jewelry retail store location in Garden City.  According to Air & Anchor's website, "[h]ome is where all of our stories begin. The same can be said for our business.  It began in 1966, and now, three generations later, we're continuing to develop new products to inspire new generations of people."  Air & Anchor, https://airandanchor.com/blogs/anchored-moments/from-past-to-present (last visited Feb. 2, 2026).

49.     Carolyn has recently learned that, from its inception, Air & Anchor has in fact occupied and used all of Cinerama's leased premises and enjoyed the use and benefit of Cinerama's assets, brand, goodwill, tradename, furniture, equipment and appliances, and without her consent, of Carolyn's inventory of unique crystals, beads and stones that she has always stored at the Factory. Additionally. Air & Anchor advertises Cinerama's vast vintage jewelry inventory archives as their own.  This is made clear by Air & Anchor's public presentation of its image:

11

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.



**Still Made In The U.S.A.**

Our desire to carry on Ralph's legacy led us to reopen the family factory that had fallen vacant, revitalizing connections with local craftsmen and artisans.

In the factory today, we have thousands of vintage beads and charms that Ralph and his team sourced and handcrafted decades ago. We love mixing these pieces into the new jewelry designs we're creating with the intention of them being worn together.

So, what's vintage for jewelry on our website right now? Breathe New Life Vintage Crystal. Find other vintage crystals with the Vintage Caged-Navette Crystal Birthstones.

Air & Anchor, https://airandanchor.com/blogs/anchored-moments/from-past-to-present?srsltid=AfmBOoo6Yq3b0wFvx5fsKd9FxOySMLVElc92wExtPJn5rsGQtm1z5M3K (last visited Feb. 2, 2026).

50.     Air & Anchor has lauded and deploys its connection to Cinerama, Alex + Ani, and the Factory in its public statements and marketing efforts.  From its very beginnings, its representatives have publicly stated or been reported to state, that in the wake of Alex + Ani's demise, "they decided to take over…[the Factory]…and put it—and Rhode Islanders—back to work," that Cinerama's jewelry stones from the "60's, 70's and 80's are still materials that we reset

12

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

and use today," and that in the basement Factory "bins and piles of clunky gold chains, ropes and beads are ready to be worked into future pieces."

51.     In fact, Rachel, in an interview describing the story of Air & Anchor, stated that Air & Anchor's designs use vintage components—"pieces that [her] grandfather [Mr. Rafaelian] purchased in the 60s and 70s"—that she re-works into modern designs.  Air & Anchor: The Story of A Family Business (youtube.com), https://www.youtube.com/watch?v=XSXLh1GgR0w (last visited Feb. 2, 2026).

52.     Moreover, in a 2024 interview with the Warwick Beacon, Omar explained that Air & Anchor's Garden City retail store was an "extension" of the "factory" "just up the road on Pettaconsett Avenue":

> Air & Anchor, a local jewelry manufacturer and retailer, held a weekend long grand opening ceremony to celebrate its Garden City popup store last week.
>
> With an in-store jewelry factory, Air & Anchor has a unique quality ability to custom create and fit pieces in store. With the focus on locally sourced products and personal customization that comes from making everything in house, owners Rachel and Omar Ajaj consider the store an extension of their factory just up the road on Pettaconsett Avenue.
>
> "You've got our normal retail products, but half of the store, actually, is called the factory," Omar explained. "You can come in and customize your length of chain. You can bead your own necklaces and bracelets. We do permanent jewelry and can even brand our serving boards that we make right here in Providence. So it's really an experiential store."
>
> The factory, which the co-owners Rachel and Omar Ajaj leased about four years ago, Omar explained, was kind of a place his wife Rachel grew up in as a third generation jewelry designer. The building was empty, they chose to lease it before sitting in the big building and saying, "what're we going to do?" That's when they set to building the factory back up.

13

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Ed Kdonian, *Air and Anchor popup has grand opening in Garden City*, Warwick Beacon (June 21, 2023), https://warwickonline.com/stories/air-and-anchor-popup-has-grand-opening-in-garden-city,214248 (last visited Feb. 2, 2026).

### F.    Air & Anchor Colludes with Rebecca to Convert Cinerama's Assets

53.    Former employees of Air & Anchor report that substantial parts of its business and operations are controlled, directed, and managed by Rebecca.  Rebecca identified herself to such employees as a "manager" of Air & Anchor.  She was at the retail store every day, directed such employees to report to her, managed all product requests and quality control, managed relationships and contracts with vendors, and directed that Carolyn should never be admitted to the premises.

54.    In addition, in early 2023, an Air & Anchor employee was directed by Rebecca, Rachel, and/or Omar to go through inventory located on the first floor of Cinerama, including Carolyn's inventory, and to re-box hundreds of inventory boxes, half of which bore Carolyn's name, their quantity, and Carolyn's signature, into new boxes which only bore quantity and SKU numbers such that all the prior identifying marks of Carolyn were removed, and the inventory items were variously immediately sold off, advertised for sale on Air & Anchor's website as vintage products, and the remainder brought to Air & Anchor's retail location for use and sale.  At no time prior to doing so or since, did Air & Anchor or Rebecca seek or obtain Carolyn's consent to such dispositions.  Upon information and belief, this wrongful conduct has continued at least as recently as Fall 2025.

55.    Air & Anchor has the same business address as Cinerama, is wrongfully using its assets and inventory without paying fair value therefor, has and continues to commit conversion of Cinerama's assets, holds itself out to the world as an "extension" or successor of Cinerama, and

14

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

trades upon for its own benefit Cinerama's goodwill, trade name, image and history, such that it is and should be declared the *alter ego* of Cinerama.

### G.    The Necessity of this Action.

56.    As a result of the Defendants' intentional and wrongful conduct, Cinerama and Pentagon have lost significant potential revenue and the value of Carolyn's respective shares have been severely diluted.   In addition, the launch of Carolyn's new business was materially delayed as she was forced, at significant expense, to acquire new space, equipment, vendors and resources to re-build her significant operations  to support Metal Alchemist, LLC which she could have merely contracted with Cinerama to perform.

57.    Metal Alchemist, LLC, which was organized in or about 2020, engages in the design, manufacture and sale of fine custom jewelry.

58.    Carolyn intended to contract with and/or form a joint venture with Cinerama in order to leverage the significant and valuable resources and inventory stored at Cinerama in support of Metal Alchemist, LLC's operations, in exchange for reasonable consideration to Cinerama; however, Rebecca refused any arrangement, stating that it was not possible.

59.    Upon information and belief, such an arrangement between Metal Alchemist, LLC, and Cinerama is only "not possible" because of the unlawful defalcation of Cinerama's assets for the benefit of Air & Anchor.

60.    Carolyn has made inquiry of Rebecca and her agents about her concerns with Air & Anchor's use of Cinerama  and its assets but has only received false and misleading responses.

61.    On or about April 2021, Rebecca, through her counsel, advised Rebecca that she would no longer receive requests from Carolyn for periodic updates on the status of Cinerama

15

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 16 of 44 PageID #: 22

operations and business plans, and that Rebecca had no interest in working with Carolyn on any future endeavors concerning Cinerama and/or Pentagon.

62.    Shortly after Carolyn's rejection of a woefully deficient buy-out offer from Rebecca, in or about December 2021, and, again in or about March 2022, Rebecca, as President of Pentagon, issued an unlawful and improper capital call to Carolyn in the amount of $250,000.00 for repairs to the Property.

63.    The unlawful capital call was made with the intention to coerce Carolyn into selling her shares in Pentagon and Cinerama to Rebecca and remains outstanding.

64.    On or about December 19, 2024, Carolyn, Pentagon's Executive Vice President and holder of fifty percent (50%) or one-half of its shares, sent a demand letter to Rebecca and Cinerama's counsel, detailing certain unlawful and/or wrongful conduct on the parts of the Rebecca, Cinerama and Air & Anchor.

65.    The letter detailed Carolyn's grievance relative to the use and occupancy of the Property by Cinerama and Air & Anchor, including, Cinerama's complete termination of its jewelry manufacturing operations at the Property in violation of the Cinerama

### H.    Rebecca Unlawfully Attempts to Extend her Scheme Five Years

66.    Despite being fully aware of the foregoing dispute, on or about May 1, 2025, without the corporate authorization required by Pentagon's By-Laws and under Rhode Island law, Rebecca unilaterally executed a First Amendment to Lease Agreement, purporting to amend the Cinerama Lease (the "Amendment"), on behalf of Pentagon and Cinerama.  The Amendment purported to extend the term of Cinerama's use and occupancy of the Property from July 1, 2025, through June 30, 2030, pursuant to the same terms and conditions of the initial Cinerama Lease.

16

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM     Document 1-1     Filed 05/08/26     Page 17 of 44 PageID #: 23

67.     The terms of the Amendment are unconscionable and the Amendment is ineffective and/or otherwise void under Rhode Island law.

68.     Separately, the Amendment was executed by Rebecca on behalf of both parties to the agreement, *i.e.*, Pentagon and Cinerama.  On this issue, Rebecca had a material conflict of interest which required full and fair disclosure of any and all of the materials terms and related facts to, and the express written authorization or consent of, Carolyn under Rhode Island law.

69.     Rebecca's additional conflicts of interest as President of Pentagon further precluded her from entering into the Amendment on behalf of Pentagon without Carolyn's express authorization, including, without limitation:

> a)  while only a 50% shareholder of Pentagon with limited control, Rebecca is the majority shareholder with full control of Cinerama, making it in her personal interest to give full control of the Property by way of a lease to Cinerama on terms more favorable to Cinerama than Pentagon, and at lowest cost to Cinerama;

> b)  the subtenant, Air & Anchor, is owned by a family relative with whom, upon information and belief, Rebecca maintains deep personal and business relationships, making it also in Rebecca's personal interest to take control of the Property at the lowest cost to the subtenant, thereby giving a personal benefit to a family member and business partner; and

> c)  Rebecca has failed and refused to disclose, and in fact has mispresented, the details of her business relationships with the subtenant, Air & Anchor, and is believed to be working for and on behalf of Air & Anchor  while unlawfully using the assets of Cinerama.

70.     The terms of the Amendment are unfair to Pentagon and result in the bestowing of personal benefits upon Rebecca to the detriment of Pentagon and Carolyn in violation of Rebecca's fiduciary duty of loyalty under Rhode Island law, causing damages to Carolyn and Pentagon and rendering the Amendment void.

71.     The Cinerama Lease, as purportedly amended by the Amendment, would impose rent through 2030 at a rate that is grossly below market rate and contains other commercially unreasonable terms.

17

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM     Document 1-1     Filed 05/08/26     Page 18 of 44 PageID #: 24

72.     In addition, Rebecca has entered into a lease on behalf of Pentagon with a tenant for the Tupelo Hill property which is also grossly below market rate and contains woefully commercially unreasonable terms.

73.     Upon information and belief, Rebecca has caused Cinerama to suspended all business operations and to cease operating a jewelry manufacturing business, in violation of the Cinerama Lease.

74.     Immediately upon receipt of notice of the Amendment, on or about May 13, 2025, Carolyn provided written notice to Rebecca and Cinerama that the Amendment was void under Rhode Island law, as well as in violation of Pentagon's corporate By-Laws (the "May 13 Notice"). Further, the May 13 Notice advised that the Cinerama Lease terminated of its own terms on June 30, 2025, as did the Sublease. Rebecca has caused Cinerama to disregard the May 13 Notice, to conduct business as though the Cinerama Lease and Sublease were in effect, and caused Pentagon to conduct business on the same false premise.

75.     Despite receipt and acknowledgement of the May 13 Notice, Cinerama has failed and/or refused to terminate its use and occupancy of the Property, or otherwise vacate the Property. Cinerama is, upon information and belief, a holdover tenant or tenant at will at this time.

76.     On or about May 14, 2025, Carolyn, in her capacity as Executive Vice President of Pentagon, provided notice to Air & Anchor that the Cinerama Lease expired of its own terms on June 30, 2025, as did the Sublease, and, as such, Air & Anchor's's tenancy was terminated effective that same date (June 30, 2025) and that Air & Anchot was to vacate the Property on or before that date (the "May 14 Notice").

77.     Despite receipt and acknowledgement of the May 14th Notice, Air & Anchor has failed and/or refused to terminate its use and occupancy of the Property, or otherwise vacate the

18

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Property.  At this time, Air & Anchor is, upon information and belief, a holdover tenant or tenant at will.

78.    Cinerama and Air & Anchor, and each of them, have breached their respective obligations under the Cinerama Lease and Sublease and each of them  has failed and/or refused to comply with the May 13 Notice and the May 14 Notice, respectively.

79.    Cinerama and Air & Anchor, and each of them, have remained in possession of the Property following the period set forth in the Cinerama Lease and Sublease.

80.    Neither Cinerama nor Air & Anchor, individually or collectively, has any legal right to continue to possess and/or otherwise use and occupy the Property, or any portion thereof.

81.    Accordingly, Carolyn, on behalf of Pentagon, is obliged to protect and preserve Pentagon's rights and has sought the eviction of Cinerama and Air & Anchor from the Property in the District Court.

82.    By letter on or about December 19, 2024, to Rebecca, Carolyn made demand of Cinerama pursuant to R.I. Gen. Laws § 7-1.2-711 and Super. Ct. R. Civ. P. 23.1 that Rebecca act on the basis of the above-described alleged misconduct that had transpired as of that date. Cinerama did not comply with this demand.

83.    Any further effort to obtain answers or to address the claims here made would be futile given Rebecca's majority control of Cinerama, her personal interests and participation in the wrongful actions referenced herein, and the deadlock in voting power and in the management of Pentagon between Rebecca and Carolyn.

84.    Carolyn can fairly and adequately represent the interests of the shareholders of Cinerama and Pentagon in enforcing the rights of the corporations.

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 20 of 44 PageID
#: 26

## V.    CAUSES OF ACTION

### Count I – Breach of Fiduciary Duty
**(Individually and Derivatively of Cinerama and Pentagon Against Rebecca)**

85.    Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 84 hereof, inclusive.

86.    As the beneficial majority and controlling shareholder and officer of Cinerama, and as one of two 50% beneficial shareholders of Pentagon, Rebecca owes a fiduciary duty of utmost good faith and loyalty to the company and Carolyn.  Rebecca has breached her duty by engaging in the aforesaid conduct, which includes, among other things, entering into and approving any number of lease and/or sublease agreements on commercially unreasonable and grossly unfair terms to the company, using corporate assets and/or property to bestow personal benefits upon herself and her family members, and, in so doing, failing to maximize the value of the company's shares and by refusing to disclose conflicts of interest to Carolyn, or otherwise obtain Carolyn's informed consent to material business transactions.

87.    As a consequence of her acts and omissions, Rebecca has and continues to breach her fiduciary duty to Carolyn, Cinerama, and Pentagon.

88.    As a consequence of the aforesaid breach of fiduciary duty by Rebecca, each of Carolyn, Cinerama, and Pentagon have suffered and continue to suffer extensive loss, cost, damage and expense.

### Count II – Waste
**(Individually and Derivatively of Cinerama and Pentagon Against Rebecca)**

89.    Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 88 hereof, inclusive.

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

90.     The use and disposition by Rebecca of the assets and/or property of Cinerama and Pentagon as described more fully above for insufficient or no value constitutes waste of Cinerama and/or Pentagon.

91.     As a consequence of Rebecca's waste of corporate assets, each of Carolyn, Cinerama, and Pentagon have suffered and continue to suffer extensive loss, cost, damage and expense.

### Count III – Conversion
**(Individually and Derivatively of Cinerama Against Rebecca and Air & Anchor)**

92.     Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 91 hereof, inclusive.

93.     Carolyn and/or Cinerama own assets and/or property, including without limitation the assets and inventory described above.

94.     Defendants have converted the aforesaid assets and inventory to their own use and/or control without appropriate or proper authority or permission or consent from, and to the wrongful exclusion of, the rightful owners of the property.

95.     As a consequence of Defendants' wrongful conduct, each of Carolyn and Cinerama has suffered and continue to suffer extensive loss, cost, damage and expense.

### Count IV – Breach of Contract
**(Derivatively of Pentagon against Cinerama)**

96.     Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 96 hereof, inclusive.

97.     Pentagon entered into the Cinerama Lease with Cinerama which constitutes a contract.

98.     Cinerama has breached the contract by, among other things, failing to vacate the Property upon expiration of the term, failing to operate a jewelry manufacturing business, failure

21

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

to pay all rent due under the Cinerama Lease, failure to properly maintain the Property, refusing to give Pentagon and its officers and directors access to the Property for inspection and engaging in unlawful conduct on the premises.

99.     As a result of Cinerama's breach of the lease, Pentagon has and continues to suffer damages.

### Count V – Breach of Contract
### (Derivatively of Cinerama against Air & Anchor)

100.    Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 99 hereof, inclusive.

101.    Cinerama entered into the Sublease with Air & Anchor, which constitutes a contract.

102.    Air & Anchor has breached the contract by, among other things, failing to vacate the Property upon expiration of the term, failing to properly maintain the Property, refusing to give Pentagon and its officers and directors access to the Property for inspection, and engaging in unlawful conduct on the premises.

103.    As a result of Air & Anchor's breach of the lease, Cinerama  has and continues to suffer damages.

### Count VI - Civil Liability for Crimes & Offenses
### (Individually and Derivatively of Cinerama and Pentagon Against Rebecca)

104.    Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 103 hereof, inclusive.

105.    As a consequence of Rebecca's actions set forth above, each of Carolyn, Cinerama, and Pentagon have suffered the conversion of their assets and seek recovery for those offenses as allowed under R.I. Gen. Laws § 9-1-2.

### Count VII - Misappropriation of Corporate Opportunity

22

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

**(Individually and Derivatively of Cinerama & Pentagon Against Rebecca)**

106.    Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 106 hereof, inclusive.

107.    As a fiduciary to Carolyn, Cinerama and Pentagon, prior to pursuing the formation or organization of Air & Anchor and investing the assets and goodwill of Cinerama into her new business venture, Rebecca should have, but did not, present the same as a corporate opportunity to Cinerama and Pentagon.

108.    As a consequence of Rebecca's failure to present this corporate opportunity to Cinerama and Pentagon, and instead pursuing it in her individual capacity through the wrongful use and conversion of Cinerama's and Pentagon's assets, each of Carolyn, Cinerama, and Pentagon have suffered and continue to suffer extensive loss, cost, damage and expense.

## Count VII – Aiding and Abetting Breach of Fiduciary Duty
**(Individually and Derivatively of Cinerama and Pentagon against Air & Anchor)**

109.    Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 108 hereof, inclusive.

110.    By the foregoing acts, including Rebecca's active involvement in the management and affairs of Air & Anchor and its wrongful possession, use and conversion of Cinerama and/or Carolyn's assets, Air & Anchor has and continues to aid and abet Rebecca's breaches of fiduciary duty.

111.    As a consequence of these acts, Air & Anchor is aiding and abetting Rebecca's breach of fiduciary duty, and each of Carolyn, Cinerama, and Pentagon have suffered and continue to suffer extensive loss, cost, damage and expense.

## Count IX –  Violation of Section 43(a)(1) of the Lanham Act (15 U.S.C. § 1125(a)(1))
**(False Association/Designation of Origin and False Advertising)**
**(Individually and Derivatively of Cinerama against Air & Anchor)**

23

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 24 of 44 PageID #: 30

112.    Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 111 hereof, inclusive.

113.    Air & Anchor has and continues to make false or misleading representations of fact in commercial advertising about its business and its products, claiming directly and through implication, and without limitation, that it has been in business since 1966, is the successor "Factory" located at the Property,  is the owner of Cinerama's vast archive of vintage jewelry inventory, machinery, equipment and other assets and is the successor or continuation of Cinerama.

114.    The misrepresentations are material to consumers' perception of Air & Anchor's products and likely to influence purchasing decisions.

115.    The misrepresentations are likely to cause confusion among the relevant purchasing public.

116.    Air & Anchor made the false or misleading statements commercial advertising and/or promotion and in connection with interstate commerce.

117.    Cinerama and Carolyn have and continue to be damaged as a result of the misrepresentations, including by either or both direct diversion of sales and a negative impact on goodwill associated with their business or products.

### Count X – Intentional Interference with Prospective Economic Advantage
### (Individually against Rebecca and Air & Anchor)

118.    Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 117 hereof, inclusive.

119.    Conversion of Cinerama's assets, likeness, and goodwill, carries along with it some of Carolyn's brand and it prohibits Carolyn from taking advantage of such and thereby results in additional costs to Carolyn in pursuing her current and future endeavors, including Metal Alchemist, LLC.

24

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

120. Defendants had knowledge that Carolyn sought to engage in future endeavors in the fine custom retail jewelry industry and intentionally interfered and intended to frustrate such efforts by their aforesaid acts.

121. As a consequence of such wrongful acts, Carolyn has suffered and continues to suffer extensive loss, cost, damage and expense.

### Count XI – Appointment of a Temporary and Permanent Receiver
### (Against Air & Anchor)

122. Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 121 hereof, inclusive.

123. Pursuant to R.I. Gen. Laws §§ 7-1.2-1314(a)(1)(i), (ii), (iv), and (v) and 7-1.2-1316, the facts, actions, and omissions as aforesaid, and in aid of equity and any decree by the Court, the Court should appoint a Temporary and Permanent Receiver to manage the business of Air & Anchor during the pendency of this action, and to recover the misappropriated assets belonging to Cinerama and Carolyn.

### Count XII – Preliminary and Permanent Injunction

124. Plaintiffs incorporate by reference as if fully set forth herein, the averments of paragraphs 1 through 123 hereof, inclusive.

125. Defendants' acts and omissions as aforesaid, including without limitation, their wrongful and continued use, possession and conversion of Cinerama's assets, inventory, goodwill and reputation has caused and continues to cause Carolyn and Cinerama to suffer irreparable harm and injury for which they lack an adequate remedy at law in the form of damages.

126. As a consequence of the foregoing, the Defendants and their employees and agents should be permanently enjoined and restrained from continuing to wrongly use and enjoy the assets, inventory, goodwill and reputation of Cinerama.

25

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

## Count XIII – Unjust Enrichment
### (Derivatively on behalf of Cinerama against Air & Anchor)

127. Plaintiffs incorporate by reference, as if fully set forth herein, the averments of paragraphs 1 through 126 inclusive.

128. Air & Anchor knowingly received and retained substantial benefits that rightly belonged to Cinerama, including the use of Cinerama's factory space at 115 Pettaconsett Avenue, inventory, machinery, equipment, vendor relationships, trade secrets, trade name, goodwill, reputation, and telephone number, as well as Cinerama's image and history in the marketplace. Air & Anchor uses all of Cinerama's factory space, equipment, inventory, phone number, management, trade secrets, tradename, vendor relationships, goodwill and reputation and holds itself out as the successor or "extension" of Cinerama Air & Anchor occupied and used all of Cinerama's leased premises and enjoyed the use and benefit of Cinerama's assets, brand, goodwill, tradename, furniture, equipment and appliances.

129. Air & Anchor also exploited Cinerama's vintage inventory archives and associated goodwill to market and sell products and to enhance its brand and sales, without paying fair value to Cinerama or obtaining appropriate authorization. Air & Anchor advertises and sells jewelry using Cinerama's "thousands of vintage beads and charms" and vast vintage inventory archives as its own Air & Anchor claimed business continuity "since 1966" and presented itself as the Factory, thereby trading on Cinerama's reputation and goodwill.

130. The above benefits to Air & Anchor were conferred at Cinerama's expense, including the loss of the use and value of its premises, assets, inventory, and goodwill, and the diversion of Cinerama's corporate resources and opportunities. Air & Anchor is wrongfully using Cinerama's assets and inventory without paying fair value therefor and has committed conversion

26

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 27 of 44 PageID #: 33

of Cinerama's assets Cinerama has suffered extensive loss, cost, damage and expense as a consequence of Defendants' wrongful conduct.

131.   Air & Anchor's retention of these benefits is inequitable because they were obtained without Cinerama's informed consent or proper authorization, on terms that were drastically below market and commercially unreasonable, and in a manner that deprived Cinerama of fair compensation. Air & Anchor's Sublease payments to Cinerama were $6,045.00 plus $1,000 per month, a rental amount that was woefully deficient, drastically below market rate and commercially unreasonable Air & Anchor's use of Cinerama's assets, inventory, goodwill, trade name, image and history occurred without appropriate or proper authority or permission or consent.

132.   Equity and good conscience require that Air & Anchor disgorge and make restitution to Cinerama of the value of the benefits unjustly retained, including, without limitation, the fair market value of the use of Cinerama's premises, assets, inventory, and goodwill, and the profits derived therefrom, in amounts to be proven at trial. Air & Anchor trades upon for its own benefit Cinerama's goodwill, trade name, image and history.

## VI.    PRAYER FOR RELIEF AND JURY TRIAL DEMAND

WHEREFORE, Plaintiffs respectfully requests that the Court grant the following relief:

a.   Award Plaintiffs damages including, without limitation, disgorgement of profits, compensatory damages, treble damages under 15 U.S.C. § 1117(a)and punitive damages  interest, costs, and attorneys' fees;

b.   Grant preliminary and permanent injunctive relief enjoining and restraining Defendants and their employees and agents from continuing to wrongly use and enjoy the assets, inventory, goodwill, and reputation of Cinerama, Pentagon, and Carolyn.

c.   Appoint a temporary and permanent receiver to manage the business of Air & Anchor as the *alter ego* of Cinerama during the pendency of this action, and

d.   Grant such other and further relief as this Court deems just and proper.

27

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM     Document 1-1     Filed 05/08/26     Page 28 of 44 PageID #: 34

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Plaintiffs,
Carolyn Rafaelian, individually and in her role as trustee of the Carolyn A. Ferlise QSST Trust-1994 and The Carolyn A. Rafaelian Trust-2004, and derivatively on behalf of Cinerama Jewelry, Inc., and Pentagon Properties, Inc.,
by their attorneys,

*/s/ Jeffrey K. Techentin*
Jeffrey K. Techentin [No. 6651]
jtechentin@apslaw.com
Geoffrey W. Millsom [No. 6483]
gmillsom@apslaw.com
Todd D. Amaral [No. 10906]
tamaral@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
100 Westminster Street, 16th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607

*/s/ Kurt T. Kalberer II*
Kurt T. Kalberer II [No. 8007]
kkalberer@kalbererlaw.com
KALBERER LLP
231 Royal Palm Way
Palm Beach, FL 33480
Tel: (401) 578-1042
Dated: April 22, 2026

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

## VERIFICATION

I, Carolyn Rafaelian, individually, and as trustee of the Carolyn A. Ferlise QSST Trust-1994 and The Carolyn A. Rafaelian Trust-2004, have read the foregoing factual allegations of this Amended Verified Complaint and, based upon my personal knowledge and review of various documents, the allegations are true and correct, except for those allegations which are made upon information and belief, and as to those allegations, they are true and correct to the best of my knowledge, information and belief.

_____
Carolyn Rafaelian, Individually and as Trustee

STATE OF _____RI_____

COUNTY OF ___WASHINGTON_____

On this 22ND day of __APRIL___ 2026, before me, the undersigned notary public, personally appeared Carolyn Rafaelian, personally known to me or proved to the notary through satisfactory evidence of identification, which was _____ to be the person who signed the preceding document in my presence, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge, information, and belief.

Notary Public _Lori A. Macentee_

My Commission Expires: _3/14/2030_

Notary Number: _768435_

> LORI A. MACENTEE
> Notary Public, State of Rhode Island
> My Commission Expires March 14, 2030

4912-7998-9902, v. 2

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 30 of 44 PageID #: 36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 22, 2026, I electronically filed and served this document through the electronic filing system on all parties receiving electronic filing notices in C.A. No. NC-2025-0531.

*/s/ Jeffrey K. Techentin*

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

# EXHIBIT A

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

# LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is made and entered into on the date, between the parties and upon the terms and conditions hereinafter set forth.

    a.    Date of Lease: as of July 1, 2020

    b.    Lessor: Pentagon Properties, Inc., a Rhode Island corporation, the office of which is located at 1 15 Pettaconsett Avenue, Cranston, Rhode Island 02920.

    c.    Lessee: Cinerama Jewelry, Inc., a Rhode Island corporation, the office of which is located at 1 15 Pettaconsett Avenue, Cranston, Rhode Island 02920.

    d.    Term of Lease: (1) From: July 1, 2020
    (2) to and including: June 30, 2025

    e.    Description of Premises: Land, building, improvements and parking areas at 1 15 Pettaconsett Avenue, Cranston, Rhode Island, as described in Exhibit A attached hereto and made a part hereof and generally outlined on Exhibit B attached hereto and made a part hereof.

    f.    Purpose: Operation of a jewelry manufacturing business and allied and ancillary activities.

    g.    Rental: The following shall be the Rental to be paid on an annual and monthly basis for the premises:

| Date Rental Commences | Date Rental Terminates | Annual Rental | Monthly Rental |
|---|---|---|---|
| July 1, 2020 | June 30, 2025 | $120,000.00 | $10,000.00 |

## TERMS AND CONDITIONS

### 1. PREMISES

Lessor, in consideration of the rents, covenants and agreements to be paid, kept and performed by Lessee as herein provided, hereby demises and leases unto Lessee the premises described above.

### 2. PURPOSE

The premises shall be used solely for the purpose set forth above and not for any unlawful purpose. Any use of the premises in violation of this provision may be enjoined by Lessor without prejudice to any other remedy therefore.

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

## 3. <u>RENTAL</u>

Lessee shall pay the rental set forth above in consecutive monthly installments, in advance, at the office of Lessor, on the first business day of each month during the term of this lease.

## 4. <u>USE OF PREMISES</u>

Lessee shall not cause or permit any waste or injury to the premises and shall keep the premises free from any and all objectionable noises, odors, rubbish and debris inconsistent with the proper operation of Lessee's usual business therein. Lessee shall conform to all rules and regulations now or hereafter established by Lessor for the general safety, car and cleanliness of the premises an the preservation of good order therein. Lessee shall comply with and observe all statutes, ordinances, regulations, orders and/or decrees of the federal, state and city governments, or any departments, bureaus or agencies thereof, or of any Insurance Inspection or Rating Bureau in any way affecting the use and maintenance of the premises, or any machinery or equipment therein, whether now in force or which may in the future be promulgated.

Lessee shall continuously comply with the provisions of the Occupational Safety and Health Act of 1970, as amended, and the regulations thereunder as well as with all other applicable federal, state or local statutes, ordinances, codes, orders, requirements, laws, rules or regulations relating to occupational health or safety matters, and any expense resulting from such compliance, relating to the premises, the use thereof or the conduct of Lessee's business therein, shall be borne by Lessee. Lessee shall forever hold and keep Lessor harmless and indemnified on account of any loss, cost, damage or liability resulting from the violation by Lessee of any such statute, ordinance, regulation, order or decree or based or in any way arising out of the use and occupancy of the premises by Lessee.

Lessee shall not make any alterations in the premises without the written consent of Lessor, and if such consent be granted, any such alteration shall be made in accordance with all applicable federal, state and municipal laws, rules and regulations. All partitions: toilet facilities and other permanent improvements to the premises shall be a part of the realty and title thereto vested in Lessor. Lessee shall not place a load upon any floor exceeding the floor load per square foot area which the floor was designed to carry and which is allowed by law.

At the expiration or other termination of this Lease, Lessee shall remove from the premises all goods and effects, and peaceably and quietly surrender to Lessor possession of the premises and of all erections and additions made to the same. Lessee will keep the sidewalks, drives and parking areas of the premises free of snow, ice and other accumulations.

## 5. UTILITIES

Lessee shall provided and pay for all heat, water for drinking and other purposes, electricity, gas and nay other utilities consumed on the demised premises and sewer, drainage and related charges or assessments connected therewith.

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 34 of 44 PageID #: 40

## 6. MAINTENANCE REPAIRS AND REPLACEMENTS

During the term of this Lease, Lessee shall be responsible for all interior and exterior maintenance and repairs to the premises, fixtures and driveways, and shall make all structural repairs and replacements of integral and component parts offte structure, premises and fixtures, toward the end that Lessor shall not be responsible for any maintenance, repairs or replacements of the premises, structure and/or fixtures.

## 7. TAXES ASSESSMENTS AND CHARGES

During the term of this Lease Lessee shall pay all taxes upon the premises. Such taxes shall include: all taxes and special assessments of every kind and nature assessed and levied against the building (as a completed taxable entity), land and fixtures including, but not limited to, any taxes upon the building, land or fixtures levied or imposed by any substitute for real estate or personal property taxes, installments of and interest on assessments for public betterments or public improvements (such assessments to be paid over the longest period permitted by law), all personal property taxes upon air conditioning equipment or similar building appurtenances and expenses, including but not limited to reasonable legal expenses, of any proceedings for abatement of taxes and assessments with respect to the first or any subsequent calendar year of fraction of a calendar year.

## 8. SERVICE CONTRACTS

Lessee shall not enter into any service, maintenance or other contracts relating to the premises which shall terminate after the expiration of the term hereof, without Lessor's written consent.

## 9. FIRE AND CASUALTY

In case the premises shall be destroyed or damaged by fire or other casualty, this lease may be terminated at the election of Lessor but if not so terminated and the premises shall be rendered unfit for occupation on account of a fire or casualty, the Rental hereinbefore reserved, or a just and proportionate part thereof according to the nature and extent of the injury sustained, shall be abated until the premises shall have been put in proper condition by Lessor. Otherwise, this Lease shall continue in full force and effect under its terms.

## 10. CONDEMNATION

In the event the whole or any part of the premises or any interest therein shall be taken or condemned by any competent authority for any public or quasi-public use or purpose, then the term of this Lease shall cease and terminate on the date when the possession of the part or interest so taken shall be required for such use or purpose or on the date of such taking or condemnation (at Lessor's option) and without apportionment of the award, it being agreed that Lessor shall be entitled to the entire amount of the award for the premises; provided, however, f only a part of the premises is so taken, and if Lessee can without necessity of any substantial repairing or alteration, carry on its business in the part of the premises not so taken

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

or condemned, this Lease shall continue in full force and effect as to the part not so taken or condemned but there shall be a proportionate adjustment of the Rental to be paid hereunder.

## 11. PROPERTY LOSS OR DAMAGE

All merchandise, furniture and property of any kind, nature and description, belonging to Lessee or any person claiming by, through or under it, which may be in, on or about the premises during the continuance of this Lease, or any extension thereof, is to be at the sole risk and hazard of Lessee; and if the whole or any part thereof shall be destroyed or damaged by fire, water, stream, smoke, by the leakage or bursting of water pipes, or in any other way or manner, no part of said loss or damage is to be charged to or to be borne by Lessor in any case whatsoever.

## 12. IDEMNITY AND INSURANCE

Lessee agrees to save Lessor harmless from, and indemnify Lessor against, any and all injury, loss or damage of whatever nature to persons or property arising out of the use or occupancy of the premises, or out of any act, omission or negligence of Lessee or anyone claiming under Lessee. Lessee further agrees, in addition to the foregoing and nt in limitation thereof, to indemnify, defend and hold harmless Lessor from and against any and all claims, demands, liabilities, costs, expenses, penalties, damages and losses, including, without limitation, attorneys' fees, as incurred, resulting from or related to any Environmental Condition (as hereinafter defined) or any violation of any Environment Law (as hereinafter defined) in connection with the premises including, but not limited to, any claim for personal injury or property damage arising from any such Environmental Condition or violation of any Environmental Law asserted by third parties against Lessor, any liabilities sustained or incurred by Lessor for the investigation, containment, removal, remedy, cleanup, remediation or abatement of any contamination arising from any Environmental Condition or any violation of any Environmental Law.

The term "Environmental Law' shall mean any law, regulation, rule or order of any governmental entity relating to pollution or protection of the environment (including ambient air, surface water, ground water, land surface or subsurface strata), including, without limitation, CERCLA, as amended, RCRA, as amended, and other federal, state or local laws, regulations, rules and ordinances relating to emissions, discharges or releases of pollutants, contaminants, chemicals, industrial, toxic or hazardous substances or solid or hazardous wastes or petroleum products or gas or any substance detrimental to the environment (collectively, "Polluting Substances") or the manufacture, processing, distribution, use, treatment, handling, storage, disposal and transportation of Polluting Substances. The term "Environmental Condition" shall mean the presence, whether discovered or undiscovered, in surface water, ground water, drinking water supply, land surface, subsurface strata, above ground and underground tanks or other containers, or ambient air of any Polluting Substances arising out of or otherwise related to the operations or other activities (included the disposition of such materials or (substances) conducted or undertaken at the premises by Lessee.

-4-

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

In the event of any discharge, spillage, contamination, uncontrolled loss, seepage, migration or filtration of a hazardous waste, hazardous substance and/or Polluting Substance within the premises as a result of any conduct of or omission by Lessee, or any employee or agent of Lessee or independent contractor engaged by Lessee, Lessee shall investigate, contain, remove, mitigate or remediate the same immediately in accordance with all applicable federal, state or local laws, ordinances, rules or regulations.

Lessee will maintain general comprehensive public liability insurance naming Lessor as an insured party with respect to the premises and their appurtenances issued by insurance companies authorized to do business in the State of Rhode Island satisfactory to Lessor in amounts not less than One Million Dollars ($1   with respect to injuries to any one person and not less than Three Million Dollars ($3,000,000) with respect to injuries suffered in any one accident, and not less than Five Hundred Thousand Dollars ($500,000) with respect to property damage. Lessee shall deliver to Lessor certificates of such insurance certifying that the same is in full force and effect. Lessee shall pay for insurance against fire and other extended coverage perils pertaining to the premises, naming Lessor as the sole insured party, in amounts not less than One Million Dollars ($1 000,000), with such clauses and with such companies as are designated by Lessor. Such policies may be purchased by Lessor who shall thereupon render invoices to Lessee for the amount of the cost of such insurance which shall be promptly paid by Lessee. The policies of casualty insurance shall be held b Lessor.

## 13. SUBORDINATION

This lease is subject and subordinate to all mortgages which may now or hereafter affect the premises, and to all renewals, modifications, consolidations, replacements and extensions thereof. This clause shall be self-operative and no further instrument of subordination shall be required by any mortgagee. In confirmation of such subordination, Lessee shall execute promptly any certificate that Lessor my request. Lessee hereby constitutes and appoints Lessor Lessee's attorney-in-fact to execute any such certificate or certificates for and on behalf of Lessee. If, in connection with obtaining financing pertaining to the premises or any portion thereof, a banking, insurance or other recognized institutional lender shall request reasonable modifications in this Lease as a condition to such financing, Lessee will not unreasonably withhold, delay or defer its consent thereto, provided that such modifications do not increase the obligations of Lessee hereunder or materially and adversely affect the leasehold interest hereby created or Lessee's use and enjoyment of the premises.

## 14. QUIET ENJOYMENT

Lessee, paying the rent and performing all the covenants, terms and conditions in this Lease contained to be performed on the part of Lessee, may peacefully hold and enjoy the premises during the term hereof without any lawful let or hindrance by Lessor or any person claiming by, through or under Lessor.

-5-

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

## 15. NO REPRESENTATIONS BY LESSOR

No representations or promises with respect to the premises, except as herein expressly set forth, have been made by Lessor, and Lessee agrees that it takes the same in their present condition and state of repair. The taking of possession by Lessee shall be conclusive evidence as against Lessee that the real estate and personal property were in satisfactory condition at the time such possession was so taken.

## 16. LESSOR'S RIGHT TO PAY MONEY TO EFFECT PERFORMANCE

If Lessee at any time, or from time to time, shall fail to perform any of the covenants, terms and conditions in this Lease contained to be performed on the part of the Lessee, Lessor may immediately, or at any time thereafter, without notice, perform the same for the account of Lessee, and in any such event, any monies paid by Lessor for such purpose shall be deemed to be additional rent due hereunder and shall be payable forthwith to Lessor upon rendition of an invoice therefor.

## 17. NO WAIVER

The failure of Lessor to seek redress for violation of, or to insist upon the strict performance of any covenant,

-6-

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

term or condition of this Lease or any of the Rules and Regulations established by Lessor under the provisions of this Lease shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation. The receipt by Lessor of rent, with knowledge of the breach of any such covenant, term or condition, Rule or Regulation shall not be deemed a waiver of such breach and no provision of this Lease shall be deemed to have been waived by Lessor unless such waiver be in writing signed by Lessor.

## 18. ASSIGNMENT

Lessee shall not assign, mortgage, pledge or otherwise encumber this Lease or its interest therein or sublet the whole or any part of the premises without obtaining on each occasion the consent in writing of Lessor. In case of any such assignment, the Assignee shall assume in writing to Lessor the performance and observance of all the convenants, terms and conditions in this Lease contained, to be kept and performed on the part of the Lessee, and such writing of assumption shall be delivered to Lessor simultaneously with said assignment. In the event of any such assignment or subletting, notwithstanding any assumption hereof by the Assignee or sublease, Lessee shall remain primarily liable for the performance of all the covenants, terms and conditions hereof.

## 19. PAYMENTS

All sums due Lessor or any other party under the provisions hereof shall be deemed to be rent due hereunder and Lessor shall have all the rights and remedies relative to the nonpayment thereof as Lessor has for the nonpayment of rent.

## 20. DEFAULTS OF LESSEE AND REMEDIES OF LESSOR

In case of failure on the part of the Lessee to pay the rent and all other charges herein provided within the fifteen (15) days subsequent to the time when the same shall become due and payable or in case Lessee shall neglect or fail to perform or observe any of the other covenants, terms or conditions imposed upon Lessee by this Lease and fail to remedy and/or remove said breach within fifteen (15) days of the receipt of the notice thereof from Lessor; or in the event that Lessee makes an Assignment for the Benefit of Creditors; or a petition is filed by or against Lessee to adjudicate it a Bankrupt; or a Debtor, Reorganization, Arrangement or similar petition or proceeding be filed by or against Lessee under any chapter or provision of the Bankruptcy Act; or in the event a Receiver is appointed over the assets of Lessee or Lessee's leasehold interest and/or property shall be attached or levied upon, and such receivership, attachment or levy is not vacated and/or removed within fifteen (15) days thereafter; or if the premises shall be deserted or vacated for a period of fifteen (15) consecutive days or more; then in any of the above cases it shall be lawful for Lessor thereupon or at any time thereafter, at Lessor's

option, and notwithstanding any waiver of any prior breach of any covenant, term or condition, to enter into and upon the premises or any part thereof in the name of the whole, by force or otherwise, and repossess the same, and to expel Lessee and those claiming by, through or under it, and remove its effects without being deemed guilty of any manner of trespass, and

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

upon entry as aforesaid the, term of this Lease shall terminate, provided that Lessor shall not be deemed to have accepted a surrender thereof.

In any such event Lessee shall indemnify and hold harmless Lessor against all loss of rent or other payments due hereunder or which Lessor may suffer by reason of such termination, including damages for anticipatory breach. This Lease shall not continue for the benefit of any Assignee for the Benefit of Creditors, Receiver, Trustee in Bankruptcy, debtor in possession or attaching Creditors.

## 21. ACCESS TO PREMISES

Lessor, Lessor's servants and agents, shall have right to enter upon the premises or any part thereof, without charge, at all reasonable times to inspect the same, to show the demised premises to prospective purchasers or tenants, or to make or facilitate any repairs or alterations to the premises, including without limitation, to install posts or columns to reinforce any floors, and to install, maintain and remove any pipes, wires and other conduits and plumbing, heating or electrical fixtures or equipment. Nothing herein shall be construed to impose any obligation upon Lessor to make repairs, and if such repairs are the obligation of Lessee in accordance with the terms of this Lease, the cost thereof shall be charged to Lessee. If Lessor is obligated by any building or fire law or regulation to construct any additional exits, Lessee will permit the construction thereof without any diminution of rent.

## 22. NO BROKER

Lessee represents that the premises, or any portion of the premises, were not presented to it or to any person representing it by any broker or other person and that no broker or other per was in involved in the leasing of the premises, and warrants that no claim for commission for said leasing shall be presented to Lessor.

## 23. NOTICE

All notices and other communications authorized or required hereunder shall be in writing and shall be given by mailing the same by certified or registered mail, return receipt requested, postage prepaid, to the parties at their addresses set forth above, or in the case of Lessee, to the demised premises, or in either case, to such Other person or at such other address as either party may hereafter designated by notice to the other party.

-8-

## 24. PARTIES AND DEFINITIONS

The terms Lessor and Lessee wherever used in this Lease shall include the successors and assigns of the parties, wherever the context requires or permits of such construction, and all of

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

the covenants, terms and conditions herein contained successors and assigns of the parties in the same manner as if they were expressly mentioned. The term Lessor as used in this Lease means only the owner for the time being of the premises, so that in the event of any sale, Lessor shall be and Lessor hereby is entirely freed and relieved of all covenants and obligations of Lessor hereunder, it being understood and agreed that the purchaser will have assumed and agreed to carry out any and all obligations of Lessor hereunder.

### 25. MEMORANDUM OF LEASE

Upon the execution hereof, the parties shall also execute a Memorandum of Lease in form reasonably satisfactory to both parties, which Lessee may record.

### 26. AMENDMENTS ADDITIONS AND DELETIONS TO ABOVE LEASE

Any alterations of deletions herein were made in the Lease before execution, and any additional provisions to which the parties have agreed and which are added herein or in any addendum attached hereto shall be considered a part hereof.

IN WITNESS WHEREOF, the parties have executed this Lease as of the date set forth

above.

WITNESS:

LESSOR:

PENTAGON PROPERTIES, INC.

By:

Its:

WITNESS:

LESSEE:
CINERAMA JEWELRY, INC.

By:

By:

Its:

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

# EXHIBIT B

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM    Document 1-1    Filed 05/08/26    Page 42 of 44 PageID #: 48

## AMENDED AND RESTATED SUBLEASE

1.    **Parties.** (a) This Sublease is by and between **Cinerama Jewelry, Inc.** ("Sublessor"), and **Productive Collaboration, LLC** ("Sublessee"), as a Sublease under the Lease Agreement between Pentagon Properties, Inc. ("Landlord") and Sublessor, as Tenant, as may be amended from time to time (the "Master Lease"). A copy of the current Master Lease is attached hereto, marked Exhibit A, and incorporated herein by reference.  This Sublease amends and replaces the Sublease between the parties dated as of the 1st day of February, 2019.

2.    **Provisions Constituting Sublease.**

(a)    Except as expressly set forth herein, this Sublease is subject to all of the terms and conditions of the Master Lease in Exhibit A, and Sublessee shall assume and perform the obligations of Sublessor as Tenant under the Master Lease, to the extent said terms and conditions are applicable to the Premises (as defined below). Sublessee shall not commit or permit to be committed on the Premises any act or omission which shall violate any term or condition of the Master Lease, In the event of the termination of Sublessor's interest as Tenant under the Master Lease for any reason, then this Sublease shall terminate.

(b)    Except as expressly set forth herein, all of the terms and conditions contained in the Master Lease in Exhibit A are incorporated herein, (with each reference therein to Landlord and Tenant to be deemed, except where the context otherwise requires, to refer to Sublessor and Sublessee) and along with all of the following paragraphs set out in this Sublease, shall be the complete terms and conditions of this Sublease.

(c)    Without limiting the generality of the foregoing paragraph, all references to Landlord in Paragraph 12 of the Master Lease, relating to insurance, shall be deemed to refer to Landlord and Sublessor.

(d)    Notwithstanding anything contained in this Sublease to the contrary, except as expressly set forth herein, Sublessee agrees and understands that Sublessor shall have no obligation or responsibility whatsoever to provide or perform any service, repair, alteration or other similar obligation which is the obligation of Landlord to provide or perform pursuant to the terms of the Master Lease. Sublessee further agrees and understands that each such obligation shall be provided or performed by Landlord and not by Sublessor; provided, however, that, where Sublessee shall notify Sublessor that Landlord is not performing any obligation under the Master Lease, Sublessor will promptly request Landlord to perform such obligation. Sublessor shall in no event be liable to Sublessee nor shall Sublessee's obligations under this Sublease be impaired or reduced or the performance thereof excused because of any failure or delay on Landlord's part in the performance or observing any obligations of Landlord under the Master Lease.

3.    **Premises.** Landlord subleases to Sublessee and Sublessee hires from said Sublessor those premises (the "Premises"), including all furniture and appliances described in Exhibit B.  In addition, Landlord also hereby subleases to Sublessee and Sublessee hires from said Sublessor those premises of approximately 4,500 square feet located on the lower floor of the building located at 115 Pettaconsett Avenue, Cranston RI 02920 which such space shall be used for storage space (the "Additional Premises"). The parties understand that Sublessor will continue to utilize the remainder of

- 1 -

59897731 v2

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

Case 1:26-cv-00293-MSM-AEM     Document 1-1     Filed 05/08/26     Page 43 of 44 PageID #: 49

the Additional Premises for its own purposes (equipment, storage, etc.) and that the loading dock area may be used in common by Sublessor and Sublessee.

4.      **Term.** The term of this Sublease shall be for a period originally commencing on February 1, 2019 (the "Commencement Date") and ending on June 30, 2025, unless sooner terminated pursuant to any provision hereof or extended as set forth below.

**Rent.**

(a)      Sublessee shall pay to Sublessor as rent for the Premises the annual amount of $72,540, payable in equal monthly installments of $6,045. Subsequent monthly rent shall be paid in advance on March 1, 2019 and the first day of each succeeding month.

(b)      From and after the Commencement Date, Sublessee shall pay as additional rent with respect to the Premises only (and not with respect to the Additional Premises) its pro rata share of all other amounts required to be paid as additional rent under the Master Lease as and when due. For purposes of this Sublease, Sublessee's pro rata share shall be 50%.

(c)      Rent for any period during the term hereof which is for less than one (1) month shall be a pro-rata portion of the monthly installment.

(d)      Rent shall be payable without notice or demand and without deduction, offset, or abatement, in lawful money of the United States of America to Sublessor at the address stated herein or to such other persons or at such other places as Sublessor may designate in writing.

(e)      If Rent is to be paid on a Saturday, Sunday or holiday, Rent shall be paid on the next succeeding business day.

(f)      In addition, Sublessee shall pay to Sublessor as rent for the Additional Premises the annual amount of $12,000, payable in equal monthly installments of $1,000.

5.      **Defaults.** If Sublessee shall be in default of any provision of this Sublease relating to the payment of rent, or if Sublessee shall be in default of any other provision of this Sublease and such default shall continue for thirty (30) days from receipt by Sublessee of written notice from Sublessor specifying the default, then Sublessor may enter the Premises, and repossess the same and expel Sublessee and those claiming under and through Sublessee without being deemed guilty in any manner of trespass, and upon entry as aforesaid, this Sublease shall terminate and Sublessor shall have all rights available to it at law or equity. Sublessee will indemnify Sublessor against all reasonable costs of subletting the Premises and all rent which Sublessor may incur by reason of such termination, provided Sublessor shall make every reasonable effort to mitigate such loss by reletting the Premises. If Sublessor shall be in default of any provision of this Sublease and such default shall continue for thirty (30) days from receipt by Sublessor of a notice specifying the default, then Sublessee may terminate this Sublease without further obligation of Sublessee, all prepaid rents shall be refunded and Sublessee shall have all rights available to it at law or equity. If either Party shall become insolvent or make a general assignment for the benefit of creditors; or if any proceeding under any bankruptcy or insolvency statute is commenced by or against either Party; or if a receiver, trustee, or liquidator is appointed to take charge of all or substantially all of either Party's assets, then this Sublease may, at the option of the other Party, terminate upon thirty (30) days prior written notice and the terminating party shall have all rights available to it at law or equity.

- 2 -

Case Number: NC-2025-0531
Filed in Newport County Superior Court
Submitted: 4/22/2026 6:23 PM
Envelope: 5629564
Reviewer: John G.

6. **Additional Space.** In the event that at any time during this Sublease additional space is available for sublease within the Premises (in addition to the Additional Premises), the Sublessor shall give Sublessee written notice thereof and Sublessee shall have the first right to lease such additional space upon such reasonable terms and conditions as Sublessor shall determine, provided, however, Sublessee shall exercise its right to sublease such additional space within ten (10) business days of the date Sublessor provides notice to the Sublessee. In the event such additional space is subleased (beyond the Additional Premises) to Sublessee, the Sublessee's pro rata share and percentage of expenses shall be increase appropriately.

7. **Notices.** All notices or demands of any kind required or desired to be given to Sublessor or Sublessee hereunder, including, without limitation, copies of any notices to or from Landlord, shall be provided in accordance with the Master Lease at the address set forth below their signatures at the end of this Sublease.

8. **Return.** Upon termination or expiration of this Sublease, Sublessee shall return and surrender the Premises to Sublessor in the manner required by the Master Lease.

IN WITNESS WHEREOF, the parties have executed this Sublease as of the date first set forth above.

**Sublessor:**
Cinerama Jewelry, Inc.

By: _____
Rebecca Rafaelian
Its: President
115 Pettaconsett Avenue
Cranston, RI 02920

**Sublessee:**
Productive Collaboration, LLC

By: _____
Omar S. Ajaj
Its: Member
115 Pettaconsett Avenue
Cranston, RI 02920

Pursuant to Paragraph 18 of the Master Lease, the undersigned Landlord hereby consents to the foregoing Sublease, all as of the date first written above.

Pentagon Properties, Inc.

By: _____
Rebecca Rafaelian
President

- 3 -

59897731 v2